UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RIJAN MALLA,

                Plaintiff,                         Case No. 2:24-cv-10205

v.                                          Honorable Susan K. DeClercq
                                                  United States District Judge

GENERAL MOTORS, LLC,

                Defendant.

_____/

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (ECF No. 21)**

In early 2023, General Motors ("GM") decided to move toward a "performance-driven" culture. To that end, it terminated almost all employees who had received a negative end-of-year performance rating for 2022, including Rijan Malla. But Malla believed that his negative performance review and termination were suspect, so he sued GM, alleging that it discriminated against him based on his race, color, religion, and national origin, and that it retaliated against him for complaining about such discrimination. GM now moves for summary judgment. As explained below, Malla's discrimination claims will be dismissed, but his retaliation claims survive.

# I. BACKGROUND

## A. Start of Employment

Rijan Malla was born and raised in Nepal and came to the United States in January 2006. ECF No. 21-2 at PageID.128. In late September 2021, he began working at GM as a "Virtual Design Development Validation and Advanced Driver Assistance Systems Active Safety Simulations Engineer." *Id.* at PageID.130, 135. In this role, Malla would create and execute simulations of active safety features to analyze their performance. ECF Nos. 21-3 at PageID.176; 21-4. At the time, the position was fully remote because of the COVID-19 pandemic. ECF No. 21-3 at PageID.182.

Once hired, Malla was assigned to the feature-development team, which consisted of six to seven engineers and was headed by technical lead Ryan Shannon. *Id.* at PageID.181. The feature-development team was a subsidiary team within a larger overall group managed by James House, who interviewed Malla and recommended he be hired. *Id.* at PageID.174–75, 181.

For Malla's first project, House tasked Malla with developing a simulation of the "lane keep assist" ("LKA") feature. *Id.* at PageID.184–85. The simulation would be used to help validate and calibrate the actual LKA feature in GM vehicles. *Id.* Malla was the sole owner of this project, *id.* at PageID.184, and because it was "highly technical and extremely complex," ECF No. 21-11 at PageID.265, it was the

only project assigned to Malla during his employment at GM, ECF No. 21-3 at PageID.184.

Also, like all new engineers, Malla had to complete a Design for Six Sigma ("DFSS") Green Belt Certification. ECF No. 21-3 at PageID.188. DFSS is an engineering problem-solving methodology, and new engineers had to complete their "green belt" by the end of their first year and their "black belt" by the end of their third year. *Id.* To receive a green belt, Malla would have to complete a series of classes and a project that demonstrated DFSS principles and solved an issue for his team. *Id.*

At the end of 2021—only three months into Malla's employment—House gave Malla his first performance review. ECF No. 21-7. House found that Malla had so far met performance and behavior expectations, ECF No. 21-7 at PageID.244, and that there were no "glaring issues" with his work, ECF No. 21-3 at PageID.183.

### B. Start of Performance Concerns

Starting in March 2022, however, House began to notice that Malla was not attending or participating in team meetings. ECF No. 21-3 at PageID.185. These included both shorter "scrum meetings" and longer weekly Wednesday meetings. *Id.*

The scrum meetings involved only the feature-development team and were hosted by Malla's direct supervisor, technical lead Ryan Shannon. *Id.* They were short, 15-minute meetings on Monday and Friday mornings and Tuesday and

Thursday afternoons. ECF Nos. 21-2 at PageID.166; 21-3 at PageID.196. They were intended to give people a chance to share what they were working on and ask for help if needed. ECF No. 21-2 at PageID.166. But Malla was not regularly participating in these meetings, sharing what he was working on, or asking for help on any technical issues. ECF No. 21-3 at PageID.185. According to Malla, attendance at scrum meetings was not tracked, and other team members were often absent from them on any given day. ECF No. 21-2 at PageID.166–67.

By contrast, the weekly Wednesday meetings were hosted by House and attended by all three of the subsidiary teams he managed, including Malla's. *Id.* at PageID.167. These meetings were around two hours long, during which people would share the status of their projects, discuss any problems they were having, and collaborate with the group. *Id.* Malla, however, often provided only vague verbal updates about his project's status, rather than sharing graphs or other data to demonstrate his progress, like others would. ECF No. 21-3 at PageID.186. During his deposition, House testified that other team members would sometimes give only verbal updates, too. *Id.* But House had no problem with this because he had "seen something from [these employees] in the past," unlike with Malla. *Id.* According to House, Malla would also sometimes skip these meetings outright, without explaining his absences or simply saying he was too busy to attend. *Id.* at PageID.187.

- 4 -

House brought up these concerns to Malla during a one-on-one meeting on March 10, 2022. ECF Nos. 21-3 at PageID.187; 21-8 at PageID.247. When House asked Malla why he missed the most recent weekly Wednesday meeting, Malla responded that he was working and ran out of time. ECF No. 21-8 at PageID.247. At that point, House asked Malla to attend all scrum meetings and all weekly Wednesday meetings.[1] After this discussion, Malla's meeting attendance improved for a time, but he would still occasionally skip some meetings. ECF No. 21-3 at PageID.187.

Around the same time, House also grew concerned with Malla's progress on the LKA simulation project. In part, this concern was fueled by Malla's cursory updates at the weekly meetings, which made it difficult for House to get a full picture of Malla's progress. ECF No. 21-3 at PageID.186. House was also concerned that, unlike other engineers, Malla had not created a plan or developed a timeline to finish his project. *Id.* at PageID.186–87. Rather, in a March 3, 2022, email status update to House, Malla requested help with "prioritization" and "next steps." ECF No. 21-10 at PageID.261. Ultimately, House had to ask Malla repeatedly to develop a list of milestones to complete by the end of 2022. ECF No. 21-3 at PageID.187. House was frustrated by this level of "hand holding." *Id.* He informed Malla that someone at his

---

[1] In his deposition, Malla first stated that House told him that these meetings were *not* mandatory. *See* ECF No. 21-2 at PageID.152. But just a few questions later, Malla clarified that he understood those meetings to be mandatory. *Id.*

level should have been able to develop a timeline independently, especially because less senior engineers were doing so. *Id.*

### C. Malla's Concerns About Coworker Comments

On May 6, 2022, House and Malla again met one on one. ECF No. 21-2 at PageID.140. According to Malla, at this meeting he expressed concerns to House that coworkers were making comments about him. [2] *Id.* at PageID.140–41.

Malla testified about some of these specific comments during his deposition. First, one of Malla's coworkers said that Malla was in the "wrong territory" in response to Malla sharing that he had just gotten back from a vacation to celebrate Diwali. *Id.* at PageID.160–61. Malla had explained that Diwali is the equivalent of Christmas for Hindu people, making it clear that he is Hindu. *Id.* at PageID.160. With this comment, Malla believed that the coworker was referring to Malla being the sole Hindu employee in the group. *Id.* at PageID.161.

Second, around March 17, 2022, a different coworker, Justin McCabe, used the term "brown noser" in an online chat. *See* ECF No. 21-28 at PageID.326. The

---

[2] GM, however, disputes that Malla mentioned anything about these incidents to House during this meeting. GM points out that both Malla and House produced notes from this meeting, but that there is no mention of any of these supposed complaints in those notes. *See* ECF Nos. 21-8; 21-18. House also testified that Malla never complained about these incidents during the May 6, 2022, meeting. *See* ECF No. 21-3 at PageID.205. Rather, as explained below in Part I.F, House says that he first learned of these incidents, and of Malla's belief that they were racially charged, on February 8, 2023. *Id.*

comment did not appear to be directed at Malla, and there was no indication that anyone in the chat, including McCabe, was talking about Malla. *See id.* Malla nonetheless believed that the comment was meant to refer to his brown skin tone, due to earlier comments McCabe had made toward him. ECF No. 21-2 at PageID.137–38. Specifically, a month earlier, McCabe had used the word "fuck" and the phrase "dumb kids" in a "get to know your coworker" meeting. *Id.* at PageID.138. Malla believed that those comments were also directed toward him. *Id.* McCabe also once referred to a specific work assignment as "poison" and said that it should be assigned to Malla. *Id.* at PageID.140.

Malla says that when he complained about these incidents to House during their May 6, 2022, meeting, House "changed the topic" and "alluded that [Malla] keep quiet," or else he "could get fired." *Id.* at PageID.148.

Moreover, Malla had other concerns that he did not explicitly mention to House during this meeting. One of these concerns related to comments that Malla says House himself had made. *Id.* at PageID.155. Specifically, Malla says that on several occasions, House asked Malla what country he was from in a "mocking" manner. *Id.* Further, during a weekly Wednesday meeting on an unspecified date, Malla says that House told the group, "Want to complain? Learn English first." *Id.* Malla felt this comment was directed at him. *Id.*

- 7 -

Another one of Malla's concerns related to a computer file called "blackman 21" that Malla had received from a coworker. *Id.* at PageID.155. Malla had requested a "reference package" that he could use for his work, and House directed a coworker to send such a package, which contained this file. *Id.* Malla could not determine the relevance of this file and considered the file's name to be a reference to his skin color that was meant to mock him. *Id.* at PageID.155–56. As Malla acknowledged at his deposition, however, the file related to a "MathWorks" function that GM uses to analyze data. *Id.* at PageID.155.

### D. Mid-Year Performance Review

In July 2022, House gave Malla his mid-year performance review, which covered the period from January 1 to June 30, 2022. ECF No. 21-11. In this review, House stated that Malla's project needed more visibility, and that Malla needed to collaborate more by attending and participating in both the scrum and weekly Wednesday meetings. *Id.* at PageID.265–66.

Based on this review, House upped his one-on-one check-ins with Malla to once a week, ECF No. 21-3 at PageID.189. But within a few months, the one-on-ones "dropped off" from occurring weekly due to unspecified reasons. ECF Nos. 21-3 at PageID.198; 21-8 at PageID.247–50.

In those intervening months, however, House continued to have problems with Malla's performance. For example, to prepare for their one-on-one meeting on

August 10, House asked Malla to create a list of "CGs" (i.e. requirements) needed to advance his LKA project. ECF No. 21-3 at PageID.192–93. Malla waited until the night before to do this and missed requirements that House thought he should have listed. ECF Nos. 21-3 at PageID.192, 204; 21-8 at PageID.247. During this same meeting, House again reminded Malla to be prepared to share more about his project and any issues he was having. ECF Nos. 21-3 at PageID.192–193; 21-8 at PageID.247.

Further, Malla again, without prior explanation, missed the weekly Wednesday meeting on August 24, 2022, and that Friday's scrum meeting. ECF No. 21-14 at PageID.273. House suspected that Malla had not been working for the past five days because his Microsoft Teams status had been appearing as "away" for that time. *Id.* When House emailed Malla about these concerns, Malla responded that he had been working the whole time but that he and his sons had been "experiencing runny nose and viral like symptoms." *Id.* Ultimately, House asked Malla to be available for "core" business hours of 9:00 a.m. to 3:00 p.m. ECF No. 21-2 at PageID.153. At this point, House also forwarded this email exchange to his manager, director Michael Fici, and House's "human resources business partner," Max Bender. ECF No. 21-4 at PageID.273. House informed both Fici and Bender that Malla's behavior was not meeting expectations, and that Malla would be "on a trajectory to a partial rating" if he did not improve. *Id.* At his deposition, Malla

maintained that his Microsoft Teams status did not mean that he was not working, as he would work on mathematical equations away from his computer. ECF No. 21-2 at PageID.153.

A few months later, at an October 12, 2022, Wednesday meeting, House asked Malla to be prepared to share data about his work at next week's Wednesday meeting. ECF Nos. 21-3 at PageID.197; 21-8 at PageID.250. At the October 19 Wednesday meeting, however, Malla did not share any data and only provided another verbal update. ECF No. 21-8 at PageID.250. For his part, Malla says that the October 19 Wednesday meeting was cut short (from two hours to around one and a half), and so he and many other colleagues only had time to provide a verbal update. ECF Nos. 21-2 at PageID.152; 21-17 at PageID.284. At his deposition, House could not recall whether the meeting had been cut short. ECF No. 21-3 at PageID.197.

### E. 2022 End-Of-Year Performance Review

Ultimately, House gave Malla a "Team GM Minus"[3] performance rating in his end-of-year review, which signified that Malla was performing below

---

[3] At the time, GM employees could receive one of three ratings: "Team GM Plus" for exceeding performance expectations, "Team GM Par" for performing to expectations, and "Team GM Minus" for performing below expectations. ECF No. 21-3 at PageID.178. If any employee was strong in one area of performance and weak in another, the manager would have to do his or her best to balance the overall rating. *Id.*

expectations. ECF No. 21-15 at PageID.277. House reasoned that Malla had not improved enough throughout the year. *Id.*

To start, House stated that Malla needed to improve his communication and collaboration skills. House noted that he and Malla "discussed many times in 2022 [Malla's] need to communicate better and more frequently," but that Malla was still "routinely absent" from the scrum and Wednesday meetings and not showing progress for his work. *Id.* at PageID.277–78. Malla, on the other hand, says that he prioritized his attendance at these meetings and would regularly attend them. ECF No. 21-2 at PageID.150, 152. Further, Malla notes that House admitted that he did not know how many scrum meetings Malla missed, given that House did not run them. ECF No. 21-3 at PageID.187. And House's own notes only reflect that Malla missed meetings on March 9, 2022 (when the issue was first raised), August 24, 2022 (when Malla says he was sick), and January 13, 2023 (which is outside of the review period). ECF No. 21-8 at PageID.247–50.

Further, House took issue with several aspects of Malla's DFSS Green Belt project, stating that it highlighted Malla's communication difficulties and that House had to push Malla to pick a project. ECF No. 21-15 at PageID.278–79. Malla, however, says that he did not need to be pushed to pick a project and actually completed it before it was due. ECF No. 21-2 at PageID.153, 167.

- 11 -

Finally, House noted in his year-end review that Malla did not always appear online in Microsoft Teams and would be away for long time periods without prior notice. ECF No. 21-15 at PageID.279. Although House asked Malla to be available for "core" business hours of 9:00 a.m. to 3:00 p.m., House did not see an improvement in Malla's availability. *Id.*

### F. Malla's Letter Requesting Reconsideration

On February 2, 2023, Malla and House met to discuss the performance review for the first time. ECF Nos. 21-2 at PageID.154; 21-3 at PageID.204; 21-16 at PageID.282. After learning that he had been rated "Team GM Minus," Malla requested a second meeting to discuss his performance in more detail, which was then scheduled for February 8, 2023. ECF No. 21-3 at PageID.199–200.

At the February 8 meeting, Malla presented House with a letter requesting that his performance rating be reconsidered and explaining the reasons behind some of his actions. ECF No. 21-17. For instance, in the letter, Malla noted that he "had a limited understanding of how things were done . . . and what expectations were on behaviors like collaboration and communication, which are highly subjective in nature." *Id.* at PageID.284 (cleaned up). Malla also stated that the COVID-19 pandemic "put quite a bit of stress" on him, because he had to deal with "multiple ER visits and isolations," which had "direct and indirect effects" on his work schedule. *Id.*

- 12 -

Most significantly, however, Malla explained that he had "decided to stay away from some meetings" because of the comments he believed coworkers had made about him, and specifically because he believed those comments to be "racially inclined":

> Over the past year, there were many deplorable comments I had to witness, seemingly collusive, in online chats that were directed towards me. For example, on Mar 17 2022, I was called a "brown noser" in a group online chat which, if I connect with other events in the year, *was collusive, derogatory, and racially inclined*. On another example, when I joined a "Get to Know your Coworker" meeting orchestrated on Feb 17 2022, a group of engineers, again in collusive manner, made derogatory comments and used profane language. I dropped the call immediately in this instance.

*Id.* (emphasis added).

According to GM, this letter was the first time that Malla complained to House or any member of management about any potential discrimination. ECF Nos. 21-3 at PageID.205; 21-5 at PageID.217–18. Indeed, despite all the meetings documented with House's and Malla's notes, and as Malla acknowledges, this letter was the first written complaint about potential discrimination. ECF No. 21-2 at PageID.157. As previously discussed above in Part I.C, Malla maintains that he brought up these same concerns to House on May 6, 2022.

In any event, after House read the letter, Malla says that House exclaimed something to the effect of "kiss my butt" and asked what country Malla was from. ECF No. 21-2 at PageID.156–57. House also asked why Malla did not raise these

- 13 -

concerns earlier, like in the one-on-one meetings they had throughout 2022. ECF No. 21-3 at PageID.200. Malla responded that it did not dawn on him to do so until later. *Id.* Of note, Malla did not mention that he had supposedly raised these comments to House beforehand, on May 6, 2022. ECF Nos. 21-8 at PageID.250–51; 21-2 at PageID.154–57.

During this discussion, House also explained to Malla that "brown noser" was not a racial reference, but rather referred to someone kissing up to a boss. ECF Nos. 21-2 at PageID.154–57; 21-3 at PageID.200. Nonetheless, House explained that name-calling and coarse language were unacceptable, and he talked to McCabe the next day to ensure such comments were not made moving forward. ECF No. 21-3 at PageID.200.

Ultimately, House did not agree to change Malla's performance rating during the February 8 meeting, but offered Malla a third opportunity to meet. *Id.*; ECF No. 21-3 at PageID.200–01. When they met for a third time two days later, Malla again stated that his performance rating was unfair, but did not explain why he thought so when prompted. ECF Nos. 21-3 at PageID.200–01; 21-8 at PageID.251. Malla asked House to explain how he could better communicate, and House again reminded Malla to share information and data about his projects and issues during Wednesday meetings. ECF No. 21-8 at PageID.251.

After this discussion, House once again confirmed that Malla's rating would not be changed but expressed his hope that they could "move forward and work together to ensure a better outcome for 2023." ECF No. 21-20 at PageID.292. House also offered Malla the opportunity to escalate the performance-review-rating dispute to a meeting with HR business partner Bender, director Fici, and House, as part of GM's "open-door"[4] process. Malla accepted this offer. *Id.*

Malla met with House, Bender, and Fici on February 24, 2023. ECF Nos. 21-2 at PageID.164; 21-21 at PageID.295; 21-6 at PageID.232–33; 21-3 at PageID.200–01; 21-5 at PageID.217–18. At that meeting, Malla briefly expressed that he felt his performance review was unfair for reasons he had explained in his letter. ECF No. 21-5 at PageID.217-218. According to Bender, Malla also admitted to them that he had "slept through many of the meetings that he was coached to attend throughout the year." ECF No. 21-6 at PageID.233.

House, Bender, and Fici were aware of Malla's discrimination complaint when they met with Malla on this date, but they ultimately decided the rating would not be changed based on legitimate issues with Malla's performance throughout 2022 that warranted the rating. ECF Nos. 21-5 at PageID.218; 21-3 at PageID.201; 21-6 at PageID.232–33; 21-22 at PageID.297.

---

[4] Information in the record about GM's open-door process is limited, but it appears to allow employees to raise concerns about manager conduct. ECF No. 21-23 at PageID.307.

### G. GM Terminates Employees with Minus Rating

Around January 2023, GM's new Chief People Officer, Arden Hoffman, assumed her duties. ECF No. 21-23 at PageID.301-302. Hoffman intended to move GM toward a more "performance-driven" culture. *Id.* at PageID.297. To execute this goal, GM planned a "performance calibration," in which it would terminate nearly all U.S. employees who had received a "Team GM Minus" rating for 2022. *Id.* at PageID.306.

Human Resources leadership, including Shannon Myers, then the director of HR policy and employee relations investigations, oversaw these "performance calibration" terminations. *Id.* at PageID.302. The terminations were scheduled to occur on February 28, 2023. *Id.* at PageID.303; ECF No. 21-26 at PageID.319-322.

Beginning the week of February 20, 2023, HR leadership informed local HR staff, including Bender, about the terminations. ECF No. 21-23 at PageID.305-306. Bender testified that he learned about the decision around February 26, 2023, at a meeting with HR leadership. ECF No. 21-6 at PageID.233. However, this meeting appeared to happen on February 20. ECF Nos. 21-23 at PageID.306–07; 22-17. Soon after this meeting, Bender broke the news to House that any employee who had received a "Team GM Minus" rating for 2022 would be terminated. ECF No. 21-6 at PageID.233, 235.

- 16 -

Prior to this communication from Bender, House knew nothing about the upcoming "performance calibration," and was thus unaware that Malla's negative rating would result in his termination. ECF No. 21-3 at PageID.201. House did not make the decision to terminate Malla, and House was "upset" because he "did not have any knowledge of [the decision] beforehand." *Id.* at PageID.202. Malla was the only employee on House's team in 2023 who received a negative rating and was terminated. *Id.* at PageID.176.

Of note, there were certain employees with a "Team GM Minus" rating who would *not* be terminated because they qualified for an exception. Criteria for exceptions were limited to employees with:

- Technical skills/expertise, critical skills for projected business needs;

- Experience/demonstrated knowledge for current and project projects and customer demand;

- Successful completion of a [performance improvement plan] *and* at least 3 "meets" or higher ratings on annual [reviews] in the past 5 years;

- A previous request for voluntary retirement that is currently pending, or previously submitted a resignation that is pending;

- A minus rating due to an isolated incident that was not performance related.

ECF No. 21-25 at PageID.317. None of these exceptions applied to Malla.

However, at her deposition, Myers also testified that GM would have looked to make an exception for any employee with a pending claim of discrimination, retaliation, or harassment. ECF No. 21-23 at PageID.305. Myers stated that GM would delay the termination decision for those employees until any pending discrimination or retaliation claims were resolved. *Id.* But Myers testified she did not know of Malla's February 8, 2023, letter alleging discrimination. ECF No. 21-23 at PageID.303–04, 308.

HR business partners like Bender were among those responsible for evaluating employees to determine their eligibility for an exception. *Id.* at PageID.303–04. They were also supposed to flag anyone currently participating in the open-door process. *Id.* at PageID.307. If an HR business partner believed that an employee met any of the exceptions, he or she could submit a brief explanation of the situation for the HR policy team's review. ECF No. 21-23 at PageID.303–04. The policy team would review the situation with the local HR business partner and make an ultimate decision as to whether or not an exception would be made. *Id.* at PageID.304.

Though it was the responsibility of HR business partners like Bender to determine whether employees with a minus rating qualified for an exception to termination, Bender testified that he was unaware of any exceptions to the terminations:

- 18 -

**Q**: In that meeting [with HR leadership] were you told that it was all — anyone with a team GM minus was terminated?

**A**: Yes.

**Q**: So you just don't know if there were potential exceptions to that rule?

**A**: Correct.

ECF No. 21-6 at PageID.234.

Later, however, on February 28, 2025, Bender stated in a declaration that he "understood that certain exceptions could apply to either delay or completely exempt Team GM Minus employees from termination." ECF No. 23-1 at PageID.679. Bender further stated that he "honestly believed" that Malla's February 8 letter "did not raise a legitimate or credible issue of discrimination." *Id.* at PageID.680. That is because Bender did not view the "brown noser" comment as anything discriminatory, but rather as a reference to "kissing up to the boss," which accords with the term's common usage. *Id.* And for that reason, Bender determined that Malla did not qualify for an exception, and did not raise Malla's case to the HR policy team. *Id.*

Malla was terminated on February 28, 2023. House and Bender met virtually with Malla to inform him of his termination. ECF Nos. 21-27 at PageID.324; 21-6 at PageID.234–35.

## H. This Lawsuit

In January 2024, Malla sued GM under Title VII, 42 U.S.C. § 1981, and Michigan's Elliot-Larsen Civil Rights Act ("ELCRA"), alleging that he was discriminated against based on his race (South Asian), color (brown), national origin (Nepalese), and religion (Hindu). ECF No. 1 at PageID.7–13. Malla further alleges that he was retaliated against when GM failed to exempt him from its termination program after he complained of national origin and race discrimination. *Id.* at PageID.14–15; ECF No. 22 at PageID.351–53.

GM filed a motion for summary judgment, ECF No. 21, which was fully briefed, ECF Nos. 22; 23; 26. A hearing is not necessary to resolve the motion. *See* E.D. Mich. LR 7.1(f)(2).

## II. LEGAL STANDARD

To prevail on summary judgment, movants must identify record evidence showing that there is no genuine dispute of material fact and that they are entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); FED. R. CIV. P. 56(a). If the movant makes such a showing, then the burden shifts to the nonmovant to identify specific facts that create "a genuine issue for trial," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (citation omitted), which requires more than a mere "scintilla of evidence," *id.* at 252, and more than "metaphysical doubt," *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574,

586 (1986). All inferences must be reasonable, logical, and drawn in the nonmovant's favor to determine whether any party must prevail as a matter of law. *See Anderson*, 477 U.S. at 251–52.

### III. DISCUSSION

#### A. Discrimination: Disparate Treatment

Malla brings discrimination claims under Title VII, ELCRA, and § 1981, all of which are analyzed under the same standards. *See Bates v. Am. Axle & Mfg., Inc.*, 2019 WL 4941946, at *2 (6th Cir. 2019) (citing *Jackson v. Quanex Corp.*, 191 F.3d 647, 658 (6th Cir. 1999)).

There are two ways for plaintiffs to prove disparate treatment. The first is by presenting direct evidence of discrimination. *Johnson v. Kroger Co.*, 319 F.3d 858, 864–65 (6th Cir. 2003). The second is by presenting circumstantial evidence "that would allow an inference of discriminatory treatment." *Id.*

Malla does not argue that he has any direct evidence of discrimination. *See generally* ECF No. 22. Rather, he focuses exclusively on circumstantial evidence of discrimination, which is evaluated under the burden-shifting framework set forth in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973).

Under this framework, Malla must first establish a prima facie case of discrimination. To do so, he must show that (1) he was a member of a protected class, (2) he suffered an adverse employment action, (3) he was qualified for the position,

and (4) the adverse employment action occurred under circumstances giving rise to an inference of discrimination. *Briggs v. Univ. of Cincinnati*, 11 F.4th 498, 508 (6th Cir. 2021) (quoting *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 707 (6th Cir. 2006)).

If Malla establishes the prima facie case, the burden then shifts to GM to proffer a legitimate, nondiscriminatory reason for its actions. *McDonnell Douglas*, 411 U.S. at 802. If GM carries this burden, then Malla "must prove that the proffered reason was actually a pretext to hide unlawful discrimination." *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 573 (6th Cir. 2000) (citing *McDonnell Douglas*, 411 U.S. at 802).

### 1. The Prima Facie Case

For purposes of this motion, the parties agree that Malla has satisfied the prima facie case's first and third prong—that he was a member of a protected class, and that he was qualified for the position. ECF Nos. 21 at PageID.114; 22 at PageID.349. As to the second prong, the parties agree that Malla's termination counts as an adverse employment action, but dispute whether Malla's minus rating itself counts too. *See* ECF Nos. 21 at PageID.114–15 n.5; 22 at PageID.349. As to the fourth prong, the parties dispute whether the adverse employment action(s) occurred under circumstances giving rise to an inference of discrimination. *See* ECF Nos. 21 at PageID.114–17; 22 at PageID.349–51. Accordingly, only the second and fourth prongs will be addressed below.

- 22 -

***Second Prong – Adverse Employment Action***. The prima facie case's second prong requires Malla to show that he suffered an "adverse employment action." Here, the parties agree that Malla suffered at least one adverse employment action—termination. *See* ECF Nos. 21 at PageID.114; 22 at PageID.348–49. But they appear to dispute whether Malla's "Team GM Minus" performance rating was itself a separate adverse action. *See* ECF Nos. 21 at PageID.114–15 n.5 (arguing that negative rating is not a materially adverse action if supported by a "legitimate motivation"); 22 at PageID.349 (arguing that negative rating is an adverse action).

Recently, the law has relaxed as to what counts as an adverse employment action. Historically, many circuits—including the Sixth—described an adverse employment action as "a *significant* change in employment status, such as hiring, firing, failing to promote, reassignment with *significantly* different responsibilities, or a decision causing a *significant* change in benefits." *See, e.g.*, *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 402 (6th Cir. 2008) (emphasis added) (quoting *Burlington Indus. v. Ellerth*, 524 U.S. 742, 761 (1998)).

But in *Muldrow v. City of St. Louis*, the Supreme Court abrogated the requirement that plaintiffs show a "significant" or similarly high level of harm to challenge an adverse employment action under Title VII. *See* 601 U.S. 346, 354–55 (2024). Although *Muldrow* involved a specific type of adverse employment action (i.e., a discriminatory transfer), the Court stressed that under Title VII, a plaintiff no

- 23 -

longer must show that the harm was "significant," or "serious, or substantial, or any similar adjective suggesting . . . a heightened bar." *Id.* at 355. The Court reasoned that Title VII says nothing about "how much worse" a plaintiff must be treated, and so any "significance" requirement inserts language into the statute that Congress never enacted. *Id.*

Based on *Muldrow*, the Sixth Circuit effectively dispensed with its own "significance" requirement for adverse employment actions. *See McNeal v. City of Blue Ash*, 117 F.4th 887, 900–01 (6th Cir. 2024). Now, an adverse employment action is simply one that "leaves the employee 'worse off respecting employment terms or conditions.'" *Id.* at 901 (quoting *Muldrow*, 601 U.S. at 355).

With this context in mind, Malla's negative performance rating was an adverse employment action. Specifically, a "Team GM Minus" rating negatively impacts an employee's bonus and eligibility for a merit raise. ECF Nos. 21-3 at PageID.199; 21-6 at PageID.228. In this way, Malla's negative rating left him "worse off," *Muldrow*, 601 U.S. at 355, because it denied him compensation that he would have otherwise received, *see Jordan v. City of Cleveland*, 464 F.3d 584, 596 (6th Cir. 2006) ("[D]enial of money would more than amply qualify as a materially adverse action as to any reasonable employee for Title VII purposes.").

In sum, Malla's termination is not the only adverse employment action he suffered for purposes of the prima facia case. Malla's negative performance rating counts, too, and is thus relevant to the analysis of the fourth prong discussed below.

***Fourth Prong – Inference of Discrimination***. The prima facie case's fourth prong requires Malla to show that the adverse employment actions he suffered occurred under circumstances giving rise to an inference of discrimination. *Briggs*, 11 F.4th at 508. Generally, plaintiffs satisfy this prong by showing that they were replaced by someone outside of their protected class, or that similarly situated non-protected employees were treated more favorably. *See McNeal*, 117 F.4th at 895.

Here, Malla concedes there is no evidence that he was replaced. ECF No. 22 at PageID.349. He therefore focuses on arguing that he was treated worse than similarly situated non-protected employees when he received a negative performance rating and was terminated based on that rating. *Id.* at PageID.349–51.

For the "similarly situated" inquiry, plaintiffs usually start by identifying specific employees with whom to compare themselves. These "comparators" serve a useful function: they provide evidence for the jury to infer that the employer's stated reasons for its actions were pretextual. *See, e.g.*, *Miles v. S. Cent. Hum. Res. Agency, Inc.*, 946 F.3d 883, 893 (6th Cir. 2020). For example, if an employer fires a Black employee for constantly showing up late but not a white employee who does

- 25 -

the same, the jury may infer that the Black employee was fired not for tardiness, but because of race.

To be similarly situated, the plaintiff and the proposed comparator "need not be identical," *Blount v. Stanley Eng'g Fastening*, 55 F.4th 504, 511 (6th Cir. 2022), but only similarly situated "in all *relevant* respects," *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 710 (6th Cir. 2006) (quoting *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998)). Relevant factors may include whether the plaintiff and comparator deal with the same supervisor, are subject to the same standards, or have engaged in comparably serious misconduct "without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Ercegovich*, 154 F.3d at 352 (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992)). Courts should not apply these factors formulaically, but should instead independently determine, in the context of each case, which aspects of a plaintiff's and comparator's employment status are relevant to the inquiry. *Id.*

Here, the fundamental flaw with Malla's "similarly situated" argument is that he fails to propose *any* specific people to serve as comparators. That lack of specificity makes it difficult, if not impossible, to weigh the above factors in any meaningful way. *See Tschappatt v. Crescent Metal Prods., Inc.*, 798 F. App'x 887,

- 26 -

889 (6th Cir. 2020) ("How can we consider these factors without a specific person in mind? We have no idea.").

Malla attempts to fill this void by comparing himself to all of his coworkers who were supervised by House, but to no effect. For instance, to counter the claim that he regularly missed meetings, Malla responds that he "would notice numerous individuals absent" from almost every meeting he attended. ECF No. 22 at PageID.349–50. And to counter the claim that he had failed to present data at meetings, Malla responds that he "witnessed the vast majority of employees . . . provide verbal only updates at meetings." *Id.* at PageID.350.

But who are these employees? Do they fall outside of Malla's protected classes, as is required for the "similarly situated" inquiry? Malla does not say. To be sure, there is record evidence that Malla was the only Hindu employee in House's group. ECF No. 21-2 at PageID.155. But Malla points to no evidence suggesting that he was the only South Asian, brown, or Nepalese employee in the group, or that these absent or non-data-sharing coworkers fell outside these protected classes. With respect to race, color, and national origin, Malla therefore fails to create a genuine fact dispute over whether similarly situated *non-protected* employees were treated better than he was.

But even assuming that the coworkers Malla complains about fell outside all his protected classes, Malla has not provided enough record evidence demonstrating

that these coworkers engaged in comparably serious misconduct. *See Ercegovich*, 154 F.3d at 352. First, consider Malla's claim that other coworkers would miss meetings. That is as specific as Malla gets. He does not, for example, provide evidence that any specific coworker missed *multiple* meetings, as he had done. Nor does Malla provide evidence that these coworkers failed to give prior notice before missing meetings, as he had repeatedly failed to do. In fact, the only record evidence on this point comes from House, and it suggests that Malla alone failed to give prior notice. *See* ECF No. 21-3 at PageID.187 ("[N]o one else [besides Malla] was not attending for no apparent reason and no reason given.").

Second, consider Malla's claim that he would see other employees give verbal updates at the weekly Wednesday meetings. Again, Malla provides no evidence showing, or even suggesting, that any of these employees provided *only* verbal updates at *every* meeting, as he had done. In fact, House testified to the contrary— that all the other employees on Malla's team had presented graphs and data at some point, and that Malla was the only employee from which House had never seen any tangible work product. ECF No. 21-3 at PageID.186. Here, too, the evidence is thus too sparse to find any comparably serious misconduct.

Third, consider Malla's claim that other coworkers under House would, at various points, have an "Away" status on Microsoft Teams, meaning they were away from their computers too. ECF No. 22 at PageID.350. However, Malla points to no

- 28 -

evidence establishing how long these employees remained on that "Away" status—let alone that any employees remained away from their computers for nearly five days, as Malla had done. For this reason, once again, Malla has not brought forth enough evidence of comparably serious misconduct.

In effect, the evidence Malla has produced—about these incidents and about the coworkers supposedly involved in them—is insufficient to create a genuine fact issue as to the prima facie case's fourth prong. At bottom, there are too many generalities and too few details for a reasonable jury to conclude that Malla was treated worse than similarly situated non-protected employees.

Even so, Malla attempts to satisfy the fourth prong—for which he must show that his negative performance rating and termination occurred under circumstances permitting an inference of discrimination—in one more way. Specifically, Malla points to how House repeatedly asked him what country he was from in a mocking manner. *See* ECF No. 22 at PageID.350–51. Malla says that House asked him this question at his job interview, and at the February 8, 2023, one-on-one meeting held to discuss the negative rating, and on several other unspecified occasions. ECF No. 21-2 at PageID.156. Malla argues that such comments about a person's national origin can constitute circumstantial evidence of discrimination. ECF No. 22 at PageID.350–51.

Malla, however, has presented no evidence indicating a causal connection between House's comments and the *only* adverse employment action that House was involved with—that is, House's decision to give Malla a negative performance rating. *See Hussain v. Highgate Hotels, Inc.*, 126 F. App'x 256, 265 (6th Cir. 2005) (holding that supervisor's statement that there are too many "brown people" in the country was not enough to infer discrimination against Pakistani plaintiff, because plaintiff "presented no evidence indicating a causal connection between this statement and the decision to terminate him").

Nor is there enough evidence to infer a causal connection between House's comments and House's negative rating of Malla based on temporal proximity. That is because the only two incidents that Malla specifically identifies happened either too long before House gave the negative rating (at Malla's job interview around September 2021) or only after House had already given the negative rating (at the February 8, 2023, meeting). Temporal proximity, therefore, cannot support finding a causal connection between these comments and the negative rating, and so there remains no evidence that House "actually acted on that [discriminatory] disposition" in giving Malla a negative rating. *See Hussain*, 126 F. App'x at 265. Accordingly, these comments fail to support the fourth prong of Malla's prima facie case.

In sum, for the above reasons, Malla has failed to establish a prima facie case of discrimination. His disparate-treatment claims must therefore be dismissed.

- 30 -

### B. Retaliation

Malla also brings retaliation claims under Title VII, ELCRA, and § 1981, all of which are analyzed under the same standards. *See Kuhn v. Washtenaw Cnty.*, 709 F.3d 612, 627 (6th Cir. 2013) ("The ELCRA analysis for retaliation claims is identical to the Title VII analysis."); *Boxill v. O'Grady*, 935 F.3d 510, 520 (6th Cir. 2019) ("The elements of a retaliation claim under § 1981 are the same as those under Title VII.").

### 1. The Prima Facie Case

To establish a prima facie case of retaliation, a plaintiff must demonstrate (1) that she engaged in protected activity, (2) that the defendant was aware of the protected activity, (3) that the defendant took an action that was materially adverse to the plaintiff, and (4) that there is a causal connection between the plaintiff's protected activity and the defendant's adverse action. *Jackson v. Genesee Cnty. Rd. Comm'n*, 999 F.3d 333, 343–44 (6th Cir. 2021). Employees engage in a protected activity when they "oppose[] any practice by the employer made unlawful under Title VII" or "participate[] in any manner in an investigation under Title VII." *Johnson*, 215 F.3d at 578 (cleaned up).

Here, viewing the facts in Malla's favor, he has established a prima face case of retaliation.

***First Prong – Protected Activity***. As to the first prong, a reasonable jury could find that Malla engaged in a protected activity when he complained in the February 8, 2023, letter about "collusive, derogatory, and racially inclined" comments made by his coworkers, including the "brown noser" comment. ECF No. 21-17 at PageID.284. Based on this letter, House, Bender, and Fici all believed Malla to be complaining of either racially motivated acts or race discrimination. ECF Nos. 21-3 at PageID.200; 21-5 at PageID.217; 21-6 at PageID.231. And Malla's sincere belief that he was opposing discrimination is enough for a retaliation claim, no matter whether the comments actually amounted to unlawful discrimination under Title VII. *Johnson*, 215 F.3d at 579–80.

***Second Prong – Knowledge***. As to the second prong, a reasonable jury could find that GM was aware of Malla's protected activity. As established, House, Bender, and Fici knew of Malla's February 8 letter and met with him to discuss its contents.

Given that Bender played a role in deciding who was ultimately terminated, through being tasked with determining whether employees—including Malla—qualified for an exception to termination, Bender's knowledge of Malla's letter and its contents is sufficient to show GM's knowledge.

***Third Prong – Materially Adverse Action***. Next, as to the third prong, a reasonable jury could find that Malla suffered a materially adverse action. Notably, the definition of "materially adverse action" in the retaliation context is not limited

- 32 -

to the "narrow definition" of "adverse employment actions" found in the discrimination context, which "includes only actions affecting the terms, conditions or status of employment." *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 346 (6th Cir. 2008). Rather, for retaliation, an action is materially adverse if "it well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006)).

Here, a reasonable jury could find that Bender's failure to submit Malla for an exception was a materially adverse action. That decision, no matter the reason it was made, ultimately resulted in Malla being terminated. And given the seriousness of this consequence, a jury could find that the action would have dissuaded a reasonable worker from making or supporting a charge of discrimination. *Burlington*, 548 U.S. at 68.

***Fourth Prong – Causal Connection***. Finally, as to the fourth prong, a reasonable jury could find a causal connection between Malla's protected activity (the February 8 letter) and the materially adverse action (not being exempted from termination). Largely, that is due to the relatively short time period between when Malla submitted the letter on February 8, and Bender's failure to flag Malla for an

- 33 -

exception to being terminated on February 28.[5] *See McNett v. Hardin Cmty. Fed. Credit Union*, 118 F. App'x 960, 965 (6th Cir. 2004) (reasoning that an "employer's knowledge of the protected activity coupled with an adverse action occurring close in time can create an inference of causation"); *see also DiCarlo v. Potter*, 358 F.3d 408, 421 (6th Cir. 2004) (finding 21-day period between protected activity and adverse employer action "significant enough to constitute indirect evidence of a causal connection so as to create an inference of retaliatory motive"), *overruled on other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009).

### 2. Legitimate, Nondiscriminatory Reasons

Because Malla has established a prima facie case of retaliation, the burden then shifts to GM to articulate legitimate, nondiscriminatory reasons for its actions. *Heady v. U.S. Enrichment Corp.*, 146 F. App'x 766, 770 (6th Cir. 2005).

GM has come forward with legitimate, nondiscriminatory reasons for its actions. Malla indisputably received a "Team GM Minus" rating, and GM has

---

[5] Malla also argues that he engaged in a protected activity when he complained about his coworkers' comments to House on May 6, 2023, and that there is a genuine fact dispute over whether House retaliated against him by giving him a negative performance rating. *See* ECF No. 22 at PageID.352–53. But House did not give Malla a negative rating until the end of December 2022—almost eight months later. Ultimately, too much time had passed between the protected activity and the materially adverse action to establish an inference of causation. *See Blosser v. AK Steel Corp.*, 520 F. App'x. 359, 363–64 (6th Cir. 2013) (finding four-month period too long to establish inference of causation). For this reason, Malla cannot rely on the May 6, 2023, meeting to establish his prima facie case of retaliation.

produced evidence that employees receiving such a rating were terminated unless they qualified for an exception. Further, GM has produced evidence of its belief that Malla did not qualify for any of the exceptions to termination. That is enough for GM to carry its burden. *See Romans v. Mich. Dep't of Hum. Servs.*, 668 F.3d 826 (6th Cir. 2012) ("Defendant's burden of articulating a legitimate, nondiscriminatory reason for its decision to discharge Plaintiff is satisfied if Defendant explains what it has done or produces evidence of legitimate nondiscriminatory reasons." (cleaned up) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981))).

### 3. Pretext

Finally, the burden shifts back to Malla to show that GM's reasons for denying him an exception and terminating him were pretextual. *Heady*, 146 F. App'x at 770. Malla can meet this burden by showing that the reasons given by GM (1) have no basis in fact, (2) did not motivate GM's conduct, or (3) were insufficient to warrant GM's conduct. *Wexler v. White's Fine Furniture*, 317 F.3d 564, 576 (6th Cir. 2003).

Critically, this burden is not a heavy one, as the Sixth Circuit has cautioned against granting summary judgment once a plaintiff has satisfied the prima facie case of retaliation. *See Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555, 564 (6th Cir. 2004) (urging caution because "in discrimination and retaliation cases, an employer's true motivations are particularly difficult to ascertain, thereby frequently making such factual determinations unsuitable for disposition at the summary

judgment stage" (citations omitted)). Rather, at the summary-judgment stage, the plaintiff need only produce "sufficient evidence from which a jury could reasonably reject [the employer's] explanation of why it fired [him]." *Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 285 (6th Cir. 2012) (quoting *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009)).

Here, Malla has produced enough record evidence for a jury to find that part of GM's proffered reason—relating to its belief that Malla did not qualify for any exceptions to termination—has no basis in fact. That is because there is a critical contradiction between the deposition testimony and the later-in-time declaration of Max Bender, about whether Bender knew of the exceptions to termination.

In his declaration, Bender claims that he not only knew of the exceptions to termination, but also determined that Malla did not qualify for any of them. *See* ECF No. 23-1. Specifically, Bender declared that he reviewed Malla's February 8 letter and determined that it was just an effort to excuse poor performance. *Id.* at PageID.679. That was because Bender did not view the "brown noser" comment as anything discriminatory, but rather as a reference to "kissing up to the boss," which aligns with the term's common usage. *Id.* at PageID.680. For these reasons, Bender declared that he "honestly believed" that Malla's February 8 letter did not raise a legitimate or credible issue of discrimination, which is why he did not flag Malla for an exception to termination. *Id.*

However, this declaration information contradicts Bender's deposition testimony, in which he testified that was unaware of any exceptions to the terminations:

> **Q**: In that meeting [with HR leadership] were you told that it was all — anyone with a team GM minus was terminated?
>
> **A**: Yes.
>
> **Q**: So you just don't know if there were potential exceptions to that rule?
>
> **A**: Correct.

ECF No. 21-6 at PageID.234.

This contradiction is critical because if Bender did not know of any exceptions, he could not have determined whether Malla qualified for any of them, which casts doubt on GM's proffered reason for Malla's termination. There thus remains a genuine issue of fact for trial. *See Reed v. City of Memphis*, 735 F. App'x 192, 198 (6th Cir. 2018) ("If an affidavit conflicts with the deposition testimony of a summary judgment *movant*, the opposite party receives the *benefit* of the conflict under the requirement that evidence is construed in the light most favorable to the non-moving party." (quoting *Smith v. Cnty. of Lenawee*, No. 09-10648, 2011 WL 1150799, at *12 (E.D. Mich. Mar. 28, 2011), *aff'd in part, rev'd in part on other grounds*, 505 F. App'x 526 (6th Cir. 2012))); *Crockett v. Abraham*, 284 F.3d 131, 133

(D.C. Cir. 2002) ("Self-contradiction by the moving party's witnesses may of course create a genuine issue of material fact precluding summary judgment.").

This contradiction is also why GM is not entitled to the benefit of the honest-belief rule. *See* ECF No. 23 at PageID.672. Under this rule, "a pretext argument falling into the first category—asserting that the reason given by the employer has no basis in fact—may be defeated by conclusive evidence that the defendant 'honestly believed' its proffered reason, and that the belief was reasonably based 'on particularized facts that were before it at the time the decision was made.'" *Briggs*, 11 F.4th at 515 (quoting *Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 714 (6th Cir. 2007)). However, if there is enough evidence for a reasonable jury to find that the employer did not have an honest belief in its proffered reason, summary judgment must be denied. *Id.*

Again, given the contradiction between Bender's deposition testimony and his declaration, a reasonable jury could find that he did not honestly believe that Malla failed to qualify for an exception to termination. On the retaliation claims, therefore, summary judgment will be denied.

## IV. CONCLUSION

Accordingly, it is **ORDERED** that Defendant's motion for summary judgment, ECF No. 21, is **GRANTED IN PART** and **DENIED IN PART**. The motion is **GRANTED** with respect to Plaintiff's disparate-treatment claims, and so

Counts I, II, and III of Plaintiff's complaint, ECF No. 1, are **DISMISSED WITH PREJUDICE**. The motion is **DENIED** with respect to Plaintiff's retaliation claims, insofar as they relate to Defendant's failure to exempt Plaintiff from termination.

**This is not a final order and does not close the above-captioned case**.

*/s/Susan K. DeClercq*
SUSAN K. DeCLERCQ
United States District Judge

Dated: July 17, 2025

- 39 -